CHEMFREE CORP v. J WALTER CHEMFREE CORP v. J WALTER May it please the Court, the Court should reverse the obvious determination in this case for one simple reason. The defendant did not meet its burden of proof. The precedent of this Court, and I'm referring to cases such as the CentraCut decision and the Prefera Scientific decision, stand for the proposition that an accused infringer needs to put on expert testimony in order to prove invalidity when you have a case where the technology exceeds the grasp of an ordinary layperson. Now, the technology that we had in this case involved a symbiotic relationship, a synergy between cleaning and degreasing chemistry, bioremediation microbiology, and then a supporting electromechanical apparatus that provides the process control that allows this process to perpetuate itself over an extended period of time and does all of that in a way that an operator can wash parts in an open-based environment without concerns about dermatology afflictions like contact dermatitis and things of that nature. The technology in this case does exceed a level that would be grasped by an ordinary layperson. And in this particular case, we go back to the procedural issue of the case, because of things like discovery violations, selecting the wrong expert or an expert from the wrong field of technology, submitting an inadequate expert report, all those things combined when you got to trial, the defendant didn't put on an adequate case of expert testimony to prove invalidity. But it was conceded, wasn't it, that this C-Wash 7 was in the prior art, right? C-Wash 7 was an off-the-shelf product from a different product application. And it was in the prior art, right? It existed in the sense that it existed. It did not exist in the art of parts washing technology, but it was an existing degreasing. And it met all of the required limitations of being non-caustic, non-toxic, non-flammable. It did, Your Honor. And the microbe that was combined with that was well known in the prior art, too, right? They used an off-the-shelf microbial cocktail that its normal application was to be used in environmental cleanup. So, yes, there were two off-the-shelf products that were used for different product applications that these inventors went out and docked, put together in an apparatus that allowed this new and novel system. Well, why is this anything other than a classic case, a classic case that was referred to in KSR, that taking known elements and combining them for their known functions? KSR spoke mostly to mechanical technology. What we have here is... But that case was certainly not limited to just mechanical technology. Well, electromechanical technology. It wasn't even limited to electromechanical technology. Yes, the factual setting was some sort of electromechanical device, but as I'm sure you appreciate, that case had some broad implications, and we have so said. I understand, and I don't disagree with the result in KSR. This case is different because what's involved in decreasing chemistry and combining that with microbiology is sufficiently unpredictable that you don't have the situation that the Supreme Court talked about in KSR where you have this finite number of identified, predictable solutions. You're not just talking about chemistry. You're not just talking about the microbes. You also have to put it in an apparatus that provides all the necessary support so that the fluid and the microbes can perpetuate itself over an extended period of time. That requires proper application of heat, proper application of aerating the fluid so that the bioremediation can take place in an aerobic setting. But the mechanical part of this was also well known in the prior art, wasn't it? Certain aspects of it were to learn. Well, certainly just having your basic safety clean mineral spirits sink on the drum apparatus existed in the prior art. What Kempfrey's inventors added to that was heat and thermostatic temperature control and a fluid circulation path through that that adequately aerated the fluid and the process so that the process could perpetuate. What part of that wasn't shown in Hackinson II? Hackinson II doesn't teach the cleaning fluid. So it teaches the mechanical aspect of it. Hackinson II has a very complex apparatus which taught that in its process you would have such rapid death cycle of microorganisms that you had to put a conical shape to the purge because there would be so much waste generated that it would turn the process into an anaerobic system which would kill the microbial culture. Kempfrey's inventors came up with a simpler apparatus with the fluid and microbes that allowed that more complex technology to take place in a simpler apparatus. I submit that that was more than adequate to get over the threshold of what it takes for patentability even under the KSR standards. There is an aspect to the district court's findings that is disturbing that I would like to take up with the court now with the court's permission. And that is this notion that you have someone of ordinary skill in the art which the district court found was unable, unassisted to combine microbes in a cleaning fluid in an operable combination. And so that in order to get the obviousness without a piece of written prior art to refer to this person of ordinary skill in the art in park washing would pick up the phone and call an environmental engineer and that environmental engineer would provide all the rest of the information he needed in order to enable the invention without any finding, without any evidence of what specific prior art literature was x'd on that would be relied on in that process. But isn't this what happens all the time when inventions are made and you have, you come up with an idea and you realize that there are certain components that are necessary and maybe it's a certain type of steel beam or a certain type of cam and you know enough to pick up the phone and call a steel beam fabricator and say here's my application and here are the parameters I need to meet. You know, can you provide the appropriate part? That's an excellent question and I can speak to that because I used to be an engineer in an aircraft factory before I went to law school and yes we built airplanes and engineers from different technology fields would all work together to build an airplane. The thing that's different here is the environmental engineer doesn't know enough about cleaning fluid chemistry in order to know or recommend what type of cleaning fluid to use in the parts washer. But he knows enough to know to call somebody that would have that information, isn't that right? The difference between an airplane example that I was giving you and here is that between the two of them they're not just practicing the state of the art. Between the two of them they're brainstorming in order to come up with a new and novel idea. Hackinson doesn't have enough information in it to teach the cleaning fluid. The environmental engineer doesn't have enough information to know what cleaning fluid to use and so he's not in a position to help the parts washing engineer know how to select microbes to put the whole package together. Hackinson doesn't disclose using a cleaning fluid. It has a very generic disclosure. It doesn't mention the chemicals that are used and any degree of specificity and it doesn't disclose the properties of the fluid. It just mentions water. It mentions a detergent. The detergent has an unnamed, unspecified surfactant in it. It mentions some unspecified nutrients. It doesn't say which ones. It mentions an unspecified anti-corrosion agent. It doesn't specify which ones. It has process control in it for pH control but it doesn't say what the pH should be, whether it's sufficiently caustic that it's going to burn the skin of the human operator. You're into your rebuttal. Would you like to reserve some time? I would like to reserve the remainder of my time with the course permission. Very good. We will reserve that time for you. Schatzel? Is it Schatzel or Schatzel? Schatzel, Your Honor. Schatzel. Very good. Thank you. May it please the Court. The appellant's objections in this case are largely to the facts as found by the District Court below. And many of those facts, in fact the two facts, were found twice. First by Judge Kemp, who sat at trial, and second by Judge Woolley, who first reviewed the evidence that was presented to him in terms of looking at proposed trial motions and then actually heard testimony himself. After that, Judge Woolley, like Judge Kemp, found that this was the classic, if you will, KSR situation and that these claims were obvious in view of the evidence that had been presented. Their issue is not that there was no evidence. Their issue is that the evidence was heard and weighed and it was found against them. What is your response to Mr. Kemp's argument that this phone-a-friend idea really doesn't fly? First, Your Honor, we would argue that there has been no augmentation of the prior art. We understand that to be their position, that the prior art was somehow expanded because one could place a call or consult with the environmental engineer. So there was no augmentation because the patent itself, for example, with relation to microbes, said that suitable species of microorganisms are well-known and reported in the art. What was found by the District Court below was that the person of ordinary skill in the art could call or consult with the environmental engineer who would know the suitable species that had been deemed part of the prior art by the patent. So the parts washer person wouldn't know how to do this. He'd have to consult somebody else. And the contention is that in considering the question of obviousness, you can't hypothesize a consultation with an environmental engineer. You can't have a teamwork approach to it. I think that's the question. I agree. The parts washer, as defined here, wouldn't know how to do this part of the invention, right? I respectfully disagree with at least part of that, Your Honor. First, the parts washer looking at Hackinson, too, would understand that you could combine a microorganism and a surfactant solution. Second of all, the parts washer then would only need to know what microorganisms could be combined with what substance. Yeah, but he would need to find that out from somebody else. And he could find that out from someone else. And he could go to the textbooks and learn. And the way that this came up, historically in this case, is important. When we deposed their expert, Dr. Gerges, in reference to the language in the patent that addressed suitable species of microorganisms were well-known and reported in the arts, we asked him about that language and said, would the parts washer, person of ordinary skill in the arts, know how to do that? And Dr. Gerges said no, he would not. We asked if the person of ordinary skill in the arts would know how to devise a test by which to determine it. Dr. Gerges again said no. We then moved for summary judgment, relying on that testimony, saying that the patent was not enabled. In that enablement proceeding, that's when the team approach first arose. After we moved for summary judgment, it was argued that a team was used to, if you will, suffice or to provide the enablement of the patented invention. How we respond, Your Honor, to your question is that what they're really asking for is a double standard. They're asking for the team approach to be suitable for use at the enablement stage which gives them a somewhat higher standard of skill that takes advantage of what the environmental engineer knows. But now that we're at obviousness, they would like to dump or to shed the team approach and have a slightly lower level of skill applied that would, in their view, make the claims not obvious. Do you have any precedent to support this so-called team approach or phonogram in an obviousness context? No, Your Honor, I do not. We've not found a situation where there has been a decision that squarely addressed it and said that it was appropriate. But we do have this. In the RICO decision, it was cited in their case. RICO says that the purpose of the person of ordinary skill inquiry is to maintain objectivity. We don't maintain objectivity if we change the level of ordinary skill in the art depending upon where we are in the trial, where we are in the issue. That invites subjectivity. It asks the court below to look at one point in time and use one level of skill and another time and use another level of skill. So that we submit that the better policy and the better approach would be to have a consistent level of ordinary skill. If you can use the team approach for enablement, which the case is for, right? Yes, sir. Then you ought to be able to use it for obviousness as well. Yes, sir. Would this be reversible error just on this issue alone? I'm not sure I understand your question. Does this constitute, let's say that we found that there was error in utilizing the hypothetical consultation, the phonogram approach, that alone, would that be enough to reverse? I think not, Your Honor, because of the facts of this case. The fact of this case is that the patent specification stated that the person of ordinary skill in the art would know about microorganisms because suitable species were well known and reported in the art. So that defined the boundary, if you will, of prior art. It would not be reversible error to say that the person of ordinary skill in the art could consult or make a phone call to learn what are all the suitable species that are known in the art. So under the fact of this case, no, sir, we cannot believe that that would be reversible error. It was argued that we would have to have expert testimony with what went after the fact. There was expert testimony. For example, in reference to whether or not the fluid taught by Hackinson, too, was biodegradable, we contend that the fluid is biodegradable because microorganisms consume surfactants. That was the testimony, not of our expert, but of their expert as introduced by them. So, for example, it was put in at record site A5591. There was expert testimony in this case that supported our position. It largely came from the plaintiff's expert. That's true. Yeah, but I mean, your problem is you didn't have an expert testify as to the combinability of the features here, the mechanical part of it, the washing, the microbes. That's correct, Your Honor. Our expert did not speak to the combinability and was, in fact, precluded from doing so. Nonetheless, as the cases say, you don't have to have expert testimony on that, and we disagree that this is a case that is so complicated or so difficult that expert testimony is required. To the contrary, again, looking at the enablement stage, it was at that point that the plaintiff, in arguing that the patent was enabled, contended that the technology here was reasonably predictable. The technology did not all of a sudden become unreasonably predictable or reasonably unpredictable simply because we were in a different stage of the trial. Our argument there is that for that issue, we do not need expert testimony and that the evidence of record was more than sufficient. Finally, with reference to Hackinson 2, we do think the natural result of the teaching there demonstrates that the disclosed fluid was biodegradable, non-toxic, non-caustic, and non-flammable.   given the disclosure of Hackinson 2. Hackinson 2 clearly would make it obvious to the person of ordinary skill in the art to select a biodegradable, non-caustic, non-toxic, non-flammable fluid. Those are discrete choices. The fluid is going to be either biodegradable or not biodegradable. It's going to be toxic or non-toxic. The person of ordinary skill in the art was well able to make the determination between those two discrete, limited choices. So regardless of whether or not it's necessarily present, it's our position in this case that the teaching of Hackinson 2 rendered it obvious to the person of ordinary skill in the art. We therefore ask that the judgment be affirmed. Thank you very much. Never a penalty for releasing time. Mr. Kemp. Thank you, Your Honor. If I may, I'd like to go to the inherency issues. It's very important for the court to keep in mind that the Hackinson technology was before the examiner during prosecution, and the key limitation of 18 of the 21 claims with respect to the cleaning fluid being non-caustic, non-toxic, et cetera, that was added, that wasn't written by the inventor, that was added by the examiner. The examiner put that in an examiner's amendment specifically in order to distinguish over the Hackinson technology. And so, Hackinson, neither Hackinson 1 nor Hackinson 2 taught that particular cleaning fluid limitation. The examiner put it in to distinguish over that in order to allow the patent. And here's the thing to keep in mind, if you look at this industry. This industry was plagued, at least the part of it that was these open systems, it was like an open sink, not the great big industrial ones, the general motors that are fully enclosed, but the small open basin ones were plagued with personal injury from dermatitis from the use of harsh chemicals. And so, for someone to come along with a parts washer with a benign solution that could effectively clean and you could bioremediate and keep the user safe, that's sufficiently novel that this invention deserves a patent and the patent should be held valid and upheld, particularly in view of examiner Stinson wrote that claim limitation in to distinguish over Hackinson and then later in the 305 application, which was the continuation, which came in after the patents ensued, when similar claims were before him in examiner's interview, which Dr. Durkee relied on, but Judge Kemp allowed in evidence for summary judgment on inequitable conduct, but then excluded on hearsay grounds for purposes of obviousness, but in that examiner's interview summary, examiner Stinson specifically said, Hackinson, too, does not teach or disclose expressly or inherently this type of a cleaning fluid. And we've argued that Judge Kemp erred by keeping that out of evidence on a hearsay objection. I don't think this court is ready to start telling the patent bar that they can't rely on prosecution histories, whether in a parent or a continuation, under the hearsay rule. And with that, I'll relinquish 30 seconds of my time. Thank you very much. Thank you, Mr. Kemp, Mr. Schetzel, Mr. Askew. Case is submitted.